# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-24628-CV-SCOLA/TORRES

RICHARD WARD,

        Plaintiff,

v.

CARNIVAL CORPORATION,

        Defendant.

_____/

## ORDER ON MOTIONS TO STRIKE EXPERTS

There are two Motions pending *Daubert* Motions before this Court: (1) Plaintiff's Motion to Strike the Testimony and Report of Defendant's Experts, [D.E. 43]; and (2) Defendant's Motion *in limine* to Strike Plaintiff's Expert Witnesses [D.E. 45], both of which were filed on December 10, 2018. The motions are now fully-briefed and ripe for disposition, and we hereby **ORDER** that each be **DENIED**.

## I.   *FACTUAL BACKGROUND*

This case presents a straightforward set of facts. On January 21, 2017, Plaintiff suffered a slip-and-fall incident in his cabin onboard the Carnival *Conquest*. [D.E. 1, p. 3]. According to the Complaint, Plaintiff entered his cabin's bathroom, steeped in water that allegedly was present on the tile floor due to a leaking pipe, and slipped. *Id*. Plaintiff contends that he suffered neck and head injuries as a result. *Id*.

Both Plaintiff and Defendant have moved to challenge the admission of the other party's proffered expert witnesses, utilizing what could generously be called a "splat-everything-against-the-wall-and-see-what-sticks" approach. Unfortunately, neither party sets forth any good cause that supports the relief requested. For the reasons discussed below, each Motion shall be **DENIED**.

## II.    *LEGAL STANDARD*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. That Rule provides that a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

A trial court ruling on the admissibility of expert testimony must engage in a three-part inquiry and consider whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable under the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011). The Eleventh

Circuit refers to these elements as the "qualification," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of the "gatekeeper" role is to "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The decision to admit or exclude expert testimony rests within the trial court's discretion, and we enjoy "considerable leeway" when determining the admissibility of this testimony. *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). The party offering the expert testimony bears the burden of laying the proper foundation for the admission of that expert's testimony, and that admissibility must be shown by a preponderance of the evidence. *Allison v. McGahn Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *Frazier*, 387 F.3d at 1260 ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

## III. *PLAINTIFF'S MOTION TO STRIKE*

Plaintiff challenges three of Defendant's proffered expert witnesses, raising the following arguments to support his Motion to Strike: (1) Dr. Theodore Feldman's opinion should be stricken because Defendant failed to timely disclose his report as required by the Court's Scheduling Order; (2) Tara Amenson, Defendant's biomechanical engineering expert, is not qualified to testify as to certain opinions,

and that others included in her report are unhelpful and not based on reliable methodology; and (3), the opinions offered by Bryan Emond, a marine engineer, cannot satisfy *Daubert* because the majority of his report relies on impermissible speculation. We address each of the arguments raised in Plaintiff's Motion below.

### A. *The Timeliness Arguments*

Plaintiff first challenges the report prepared by Dr. Theodore Feldman's ("Feldman"), arguing that it should be excluded because it was untimely. Under Rule 37 of the Federal Rules of Civil Procedure, "if a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence…at a trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). Whether failure to make sufficient expert disclosures is substantially justified or harmless depends on many factors, including: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence." *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1250–51 (M.D. Fla. 2012). Sanctions may be warranted if a late disclosure deprives a party of the ability to disclose a rebuttal expert, impairs its ability to effectively cross examine the expert at his deposition, changes the scope of the claims, or otherwise "greatly affect[s] the orderly handling of th[e] case." *Id.* at 1251–52.

Here, sanctions would be inappropriate under the circumstances. The Scheduling Order set September 21, 2018 as the deadline to exchange expert witness summaries and reports. [D.E. 10]. Defendant sent correspondence to Plaintiff's counsel that shows it intended to comply with the Court's deadline on that date, but accidentally omitted attachment of Dr. Feldman's report. Carnival quickly rectified the issue three days later, sending another e-mail to Plaintiff's counsel that included the missing report and explaining its omission. As such, there is no indication that the omission was intentional or otherwise prejudiced Plaintiff's preparation of his case, and it can hardly be argued that sanctions would be appropriate for what amounted to a three-day delay in receipt of the report at issue. To strike the report for such a small misstep would be draconian and inappropriate. *See OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1364 (11th Cir. 2008) (finding plaintiff violated Rule 26 but the violation was harmless because the passage of time did not affect defendant's ability to prepare rebuttal report).[1]

In his Reply, Plaintiff also challenges Defendant's inclusion of two declarations prepared by Dr. Amenson and Mr. Emond and filed in conjunction with Defendant's Response to Ward's Motion to Strike. [D.E. 70]. Plaintiff argues that both declarations seek to "remedy the deficiencies included" in the original reports, and constitute new opinions untimely disclosed. *Id.* at 1-2.

---

[1] Ward seemingly abandoned this argument entirely, as the Reply to Carnival's Response did not address Defendant's explanation on the issue.

Rule 26(e) governs a party's duty to supplement an expert's report. That Rule requires supplementation or correction of expert disclosures "in a timely manner" if a party learns that "the disclosure or response is incomplete or incorrect," and if the additional or corrective information "has not otherwise been made known to the other parties during the discovery process." Fed. R. Civ. P. 26(e)(1)(A). Any additions or changes to an expert's report, or to information given during the expert's deposition, "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). As discussed above, if a party fails to comply with the disclosure requirements, we must then determine whether such a failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1) We have broad discretion in making such a determination. *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 2009 WL 92826, at *3 (M.D. Fla. Jan. 14, 2009).

Based upon a review of relevant case law – and comparing the declarations provided by Amenson and Emond with their respective reports – we find that neither declaration constitutes a "new" expert opinion. Both declarations build upon the original reports, without changing any of the conclusions or opinions found therein. *See In re Accutane Prods. Liab. Litig.*, 2007 WL 201091, at *1 (M.D. Fla. Jan. 24, 2007) (denying motion to strike supplemental expert report where the report included additional literature review and, in some areas, a degree of new or additional rationale in support of the expert's conclusions, but the core opinions remained the same); *cf. Goodbys Creek, LLC v. Arch Ins. Co.*, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009) (excluding expert's untimely second report because it contained

opinions regarding claims that went unaddressed in the initial report); *K&H Dev. Group., Inc. v. Howard*, 255 F.R.D. 562, 567-68 (N.D. Fla. 2009) (striking expert's "supplemental" report that included a new theory of damages based on information available when expert prepared initial report). The supplemental declarations merely shed light on the basis supporting both experts' opinions and their qualifications, the methodology used, and the rationale supporting those conclusions; but they do not contain *new* opinions that went undisclosed during the discovery process. For this reason, any untimely disclosure of the declarations would be harmless, and the Motion to Strike should be denied. *See Mahavisno v. Compendia Bioscience, Inc.*, 2015 WL 4394214, at *3 (E.D. Mich. July 16, 2015) (holding that party's untimely submission of supplemental expert report was harmless because alleged new report expressed the same opinion as the original expert report).

Accordingly, the motion to strike the expert reports based on Plaintiff's timeliness arguments is **DENIED**.

### B. <u>Dr. Tara Amenson</u>

Plaintiff's next challenge involves alleged shortcomings in the testimony to be offered by Dr. Tara Amenson, who reached the following conclusions in her report: (1) Plaintiff's age, physiological challenges, and gait likely contributed the slip and fall event; (2) the description of how Plaintiff stepped into the bathroom and slipped is inconsistent with the biomechanics and kinematics of walking and slip events; and (3) Mr. Ward's interaction with the open bathroom door would not result in a head impact as described in the testimonial evidence. [D.E. 43-1]. Plaintiff, in turn,

challenges all three opinions, claiming that Dr. Amenson is not qualified and that her methodology is insufficient for purposes of *Daubert*.

We disagree that Dr. Amenson's qualifications are problematic. Rule 702 of the Federal Rules of Evidence states that an expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony" and ascertain whether the expert is qualified to testify competently regarding the matters he or she intends to address. *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (internal quotation and citation omitted). But a determination as to an expert's qualifications is not a stringent inquiry, "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (an expert is "not necessarily unqualified simply because her experience does not precisely match the matter at hand.").

Amenson is a biomedical engineer with extensive academic and real-world experience in the fields of biomechanics, human factors, and human ambulation. Her *curriculum vitae* reflects her extensive participation in cases involving automobile and other accidents, and shows ongoing involvement in slip and fall investigations like the one alleged by Plaintiff here. She is also certified to use the XL tribometer, a

tool used to measure the slip resistance of particular walking surfaces which is commonly relied upon by experts in these types of cases.[2] In order to properly utilize the tribometer, Amenson needs to obtain re-certification every three years; such certification requires continuous participation in educational and training programs. This certification qualifies her to do much more than simply use this particular instrument, as it involves ongoing participation in training programs related to the device. That training relates to topics such as walkway safety, safety engineering, footwear bottom materials, loss of control, surface materials, performance and quality control, kinesiology, and biomechanics.

Thus, we are satisfied that Amenson's education, training, and experience sufficiently qualify her to serve as an expert in this case. Defendant has met its burden in showing Amenson's extensive experience in this field qualifies her as an expert to render opinions at trial, and Plaintiff may challenge those qualifications during cross examination should he wish to do so. *See Clena Investments*, 280 F.R.D. at 660-61 ("[A]fter an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination.") (quotation and citation omitted); *see also Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 n.10 (5th Cir. 1999) ("As long as some reasonable indication

---

[2]     Plaintiff argues that Amenson's certification as an XL Tribometrist is irrelevant because she did not test the floor in this case. We disagree. The issue is not whether she actually used the instrument, but whether the training involved with certification in the use of the tribometer qualifies her to render "expert" opinions on the biomechanical circumstances surrounding Plaintiff's fall. We find that it does.

of qualifications is adduced…qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity.").

Plaintiff's challenge to Dr. Amenson's methodology also fails. In the Motion, Plaintiff argues that Amenson's report is void of *any* methodology that can be considered reliable. [D.E. 43, p. 6]. Indeed, Mr. Ward states that Amenson simply bases her conclusions on "hypotheticals" and "inappropriate speculation," and that her opinions qualify as impermissible *ipse dixit* under *Daubert*. *Id*. We disagree.

Rule 702 states that an expert may testify only if "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1999); *see also Frazier*, 387 F.3d at 1261 (defining the reliability prong as distinct from the qualification prong and finding that a qualified expert may still not offer unreliable opinions). The court must perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593-94. The Supreme Court has provided a non-exhaustive list of factors to guide courts in assessing the reliability of an expert's opinion, including "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 593-94).

Regardless of the specific factors considered, proposed testimony "must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. In most cases, the expert's testimony "must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. *Cook*, 402 F.3d at 1113. And an expert's unexplained assurance that the opinions rely on accepted principles, standing alone, is insufficient. *McClain v. Metabolite Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005); *Frazier*, 387 F.3d at 1261.

Plaintiff argues Dr. Amenson failed to support each of her opinions with any analysis as to "how or why she came to her conclusions." [D.E. 43, p. 6]. But this argument ignores the information made available to the expert, which Amenson listed in her report. In particular, Dr. Amenson reviewed photographs of the scene at issue, Plaintiff's deposition testimony, and the passenger injury statement completed by Mr. Ward on the date the incident took place. [D.E. 43-1]. Dr. Amenson also utilized medical documents and information provided by Plaintiff during the discovery process, and included a list of the publications she consulted in connection with the preparation of her report. *Id*. Using the information gleaned from these materials, Dr. Amenson conducted an analysis of the subject incident and ultimately made determinations as to the state of things at the time that incident took place.

This satisfies *Daubert*. The report shows that the information provided by Mr. Ward, including testimony made during his deposition, provided ample "fodder" for her to make the various determinations included in her report. As an example, Dr. Amenson discusses the act of ambulation and the biomechanical systems implicated by that task; she then pairs that information with Mr. Ward's description of the fall, which involved his right foot "slipping" while he attempted to use the left foot for stability. Dr. Amenson, sufficiently qualified to opine on the human gait, then used that description to conclude that Mr. Ward's version of events appears to be impossible from a biomechanical perspective. While certainly not definitive proof on what actually occurred, the reliance on this information directly rebuts Plaintiff's contention that *none* of the conclusions reached by Dr. Amenson are supported by *any* facts, especially if one compares her findings with the literature the doctor claims she relied upon when preparing her report. Under these circumstances, it is easy to trace a line from the facts presented by Ward to the ultimate conclusions Amenson reached.

The same is true for the first and third conclusions. Dr. Amenson reviewed medical records that gave Plaintiff's age, height and weight on the date of the incident, and Defendant's response makes clear that she used this information to evaluate Plaintiff's body mass index, the contribution of his age to slip and fall incidents, and the likelihood that his physical condition in some way influenced the events leading to the fall in question. This information provides more than enough support for the conclusions Dr. Amenson draws from the facts, as presented by Plaintiff, as to how his physical condition may have contributed to the fall. *See Jones*

*v. Otis Elevator Co.*, 861 F.2d 655, 662-63 (11th Cir. 1988) ("Expert testimony is admissible [if it] connects conditions existing later to those existing earlier[,] *provided the connection is concluded logically*.") (emphasis added); *cf. Amos v. Rent-A-Center, Inc.,* 2001 WL 36095915, *3 (S.D. Fla. Dec. 13, 2001) (court granted *Daubert* motion in part because record did not contain documents referencing the procedure expert used in evaluating the incident and the articles cited as support were unrelated to the issue at hand).

We would also be remiss if we failed to acknowledge that Plaintiff elected not to depose Amenson in this case.[3] The decision not to do so is curious in light of the arguments raised by Plaintiff in his Motion, as the alleged "analytical gaps" and "speculation" attributed to Dr. Amenson by Plaintiff – including those pertaining to her methodology – appear to exist in large part as a result of Ward's failure to develop a record that might have shed light on those issues. *See Continental Motors, Inc. v. Jewell Aircraft, Inc.*, 2013 WL 5530842, at *7-8 (M.D. Ala. Oct. 4, 2013) (denying motion to strike based on party's decision to "plung[e] into a full-blown *Daubert* [challenge] without first taking [the expert's] deposition."). We are in no way saying that Plaintiff was *required* to depose Dr. Amenson. But if Plaintiff lacks salient details as to what Dr. Amenson did or did not do in reaching her conclusions, or how the literature supports her findings, it seems to us that this occurred as a result of

---

[3] Such a failure does not change our ultimate finding, as the expert report provides sufficient evidence for the Court to rule on Plaintiff's motion.

Plaintiff's own failure to seek the information he claims he now does not possess, and not because the expert's process is somehow lacking.

Nevertheless, we are satisfied with, and find reliable, Amenson's methodology, including how she applied her process to the facts at hand. *See Allison*, 184 F.3d at 1312 ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."). The criticisms contained in Plaintiff's Motion are more appropriate at trial and upon cross examination, as any such objections go to the weight of the evidence rather than its admissibility. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003).

The remaining challenges as to Dr. Amenson are likewise rejected. Ward's hearsay argument is unavailing because he fails to identify what, exactly, Defendant is doing to "bypass the rules prohibiting hearsay," and Rule 703 permits experts to rely on such hearsay (or any other inadmissible evidence) to support his or her conclusions. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Further, Amenson's opinion about how the fall occurred does not constitute improper impeachment evidence, as the doctor's report makes clear that her conclusion is drawn from Plaintiff's own description of how the event unfolded and these concerns are better left for "vigorous cross-examination." *Daubert*, 509 U.S. at 596. And Ward's conclusory claim that the doctor's testimony will not assist the trier of fact – set forth in a throwaway

paragraph, without citation to a single legal authority supporting the argument – is likewise ineffective.

For these reasons, we will deny the Motion as to Dr. Amenson. She may testify at trial as to all conclusions contained within her report.

### C.   *Bryan Emond*

Plaintiff also argues Defendant should be precluded from eliciting testimony from Bryan Emond, a marine engineer who conducted an inspection of the bathroom where Ward's fall allegedly took place. Emond offers three significant opinions in his report: (1) "the bathroom walking surface is slip-resistant in both the dry and wet conditions"; (2) "[i]t is not a practice within the maritime industry to open closed bulkheads to perform a visual inspection of piping that will provide no useful information"; and (3) Defendant's "practice of addressing potable water leaks as they are identified is consistent with good marine practice." [D.E. 43-2].

As an initial matter, we find Emond is sufficiently qualified to offer the opinions contained in his report. Emond possesses over thirty years of experience in fields related to marine safety and engineering. [D.E. 43-5]. His current position involves technical analysis with a focus on various maritime issues, including recreational boating accidents, piping system failures, human factors, and walkway safety. *Id*. He is a retired commissioned officer in the United States Coast Guard, where he previously served as a Staff Engineer, Team Leader, Executive Office and Commander. *Id*. He was a division chief in the "Human Element and Ship Design" division of the U.S. Coast Guard until 2006, before retiring and entering the private

sector. *Id*. His resume reflects familiarity with various marine safety and construction codes, comprehensive experience with various vessel systems, and involvement in performance of safety evaluations in many aspects of the maritime industry. *Id*.

Undeterred, Plaintiff takes issue with his alleged lack of "hands-on experience" with piping systems, which Ward argues should preclude him from offering opinions related to the *Conquest*'s piping. [D.E. 43, p. 13]. We disagree. Like we stated in the section concerning Dr. Amenson's qualifications, an expert may be qualified to testify in multiple ways, and is "not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129 (citing *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001)). And Plaintiff's challenge ignores large portions of Emond's resume that touch upon his experience with vessel piping systems, such as (1) his lengthy experience as a Project Engineer, where he deals with piping system failures, (2) his experience as a Commissioned Officer with the United States Coast Guard, which involved "review and approval of ship designs," including systems related to "piping [and] pressure vessels," and (3) his time as a Staff Engineer with the Coast Guard, which involved overseeing tasks related to "shipboard mechanical systems, including [ ] piping." [D.E. 43-5].

As stated above, an expert's qualifications – "so long as the expert is minimally qualified" – go to credibility and weight, not admissibility, and are better-explored at cross examination." *Clena Investments*, 280 F.R.D. at 660 (citations omitted). We further reject Plaintiff's contention that "many of Emond's opinions are lay opinions,"

given a cursory review of his report and his resume. Both clearly show that his analysis does not "result [ ] from a process of reasoning familiar in every day life," but instead "from a process of reasoning that can be mastered only by specialists in the field" of marine safety. *Sanchez-Knutson v. Ford Motor Co.*, 2016 WL 3944061, at *3 (S.D. Fla. July 11, 2016) (citations omitted). Emond's declaration solidifies our confidence in his qualifications as an expert, and the contention that his opinions are "lay" is therefore rejected in its entirety.

We are likewise unpersuaded by Plaintiff's arguments with regard to Emond's methodology. Based on our review of the report and Mr. Emond's observations providing the basis for his conclusions, we find that the report and testimony on the issues contained therein are admissible. In fact, almost every single challenge raised over Emond's methodology involves an attack on the "factual underpinnings" of his ultimate conclusions, which – as we have repeated many times – goes to the weight and credibility of the expert's testimony, not to its admissibility." *See Sorrels v. NCL (Bahamas), Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015); *Acevedo v. NCL (Bahamas) Ltd.*, 317 F. Supp. 3d 1188, 1197 (S.D. Fla. 2017).

For example, Plaintiff argues that Emond "assumes facts in order to formulate a hypothetical calculation to support the defendant's theories." [D.E. 43]. There is nothing inherently flawed about an expert relying on facts he or she assumes, as the Supreme Court has observed that "an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *William v. Illinois*, 567 U.S. 50, 57 (2012) (citing Fed. R. Evid. 703). We are also not convinced by Plaintiff's

argument that Emond actually assumed facts here; Plaintiff would ask that we require pinpoint-specificity when Emond provided details about the pressure capabilities of the cabin's piping system or the depth of water Ward claims was present on the date in question.[4] Any failure, as Plaintiff claims, to "identify the actual water pressure of the ship's plumbing" (as opposed to the maximum pressure Emond includes in his report) is not required by *Daubert*, and even if we were to assume the contentions raised by Plaintiff to be true, the factual bases by which Emond prepared his report would go to the weight of the opinions drawn from same, not admissibility. *See Mcgarity v. FM Carriers, Inc.*, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) ("[T]he identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible under *Daubert*."); *Hightower v. Goldberg*, 2018 WL 296955, at *2 (M.D. Ga. Jan. 4, 2018) ("Defendants' objections go to the weight and credibility of Mr. Beauchamp's opinions, not their reliability. If Mr. Beauchamp failed to consider certain facts in forming his opinions, Defendants will be able to vigorously cross examine him, present their own expert testimony, and tell the jury why they believe his opinion should not be believed."); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) ("Courts have found that most contentions that [an expert's] assumptions are unfounded go to

---

[4] The report shows a sufficient factual basis for the opinions, as it indicates Emond relied on materials in the record – including "plumbing specifications provided by Carnival" and Ward's own description of the depth of the water allegedly present in the bathroom – to reach his conclusions.

the weight, not the admissibility, of the testimony, and a district court has discretion…to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.") (internal quotation marks and citation omitted).

The other arguments included in Plaintiff's Motion all raise similar, factual-based challenges that do not support a Motion to Strike at this stage in the proceedings. For these reasons, Plaintiff's Motion as to Mr. Emond will also be denied in its entirety.

## IV. DEFENDANT'S MOTION

Not to be outdone by Plaintiff's scattershot, include-every-argument-under-the-sun tactics for challenging Carnival's witnesses, Defendant decided to join in. Indeed, Carnival's Motion throws caution to the wind and takes a metaphorical howitzer to each report in the hopes that one of the arguments hits home. None do. For the reasons discussed below, the Motion is denied.

### A. *Diffusion Tensor Imaging*

Defendant first broadly challenges any expert's reliance on an MRI report prepared by Dr. Andrew Walker on February 28, 2018 because the report utilized diffusion tensor imaging ("DTI") data, which Carnival describes as a "relatively new MRI-based analysis technique." [D.E. 45, p. 3]. Carnival then proceeds to argue that DTI data should not be used in legal proceedings for "mild traumatic brain injuries," which it alleges is the extent of Plaintiff's injury. *Id.*

Ignoring the fact that Defendant argues that Mr. Ward only suffered a "mild" traumatic brain injury – which on its face not only appears to be an oxymoron, but is also not a conceded fact – Defendant's arguments are wholly without merit. As Carnival concedes in its Motion, "some courts throughout the country…have admitted DTI MRI testimony." [D.E. 45, p. 5]. "Some" would be an understatement; a basic Westlaw search on the subject shows that numerous courts, facing challenges identical to the arguments set forth in Defendant's Motion, found DTI data to be reliable, helpful, and admissible. *See Marsh v. Celebrity Cruises, Inc.*, 2017 WL 6987718, at *4 (S.D. Fla. Dec. 15, 2017) ("DTI findings and testimony have been deemed reliable and admitted by courts across the country for almost a decade."); *Barnett v. National Continental Ins. Co.*, 2019 WL 126732, at *6 (M.D. La. Jan. 8, 2019) (finding DTI data admissible and stating that "Defendants' broader attack on [the expert's] reliance on DTI is simply unsupported."); *Andrew v. Patterson Motor Freight, Inc.*, 2014 WL 5449732, at *8 (W.D. La. Oct. 23, 2014) ("In sum, the evidence submitted shows DTI has been tested and has a low error rate; DTI has been subject to peer review and publication; and DTI is a generally accepted method for detecting TBI."); *White v. Deere & Co.*, 2016 WL 462960, at *3 (D. Col. Feb. 8, 2016) (finding doctor utilizing DTI data applied a reliable methodology); *Roach v. Hughes*, 2016 WL 9460306, at *3 (W.D. Ky. March 9, 2016) ("DTI of the brain is a proven and well-established imaging modality in the evaluation and assessment of normal and abnormal conditions of the brain.") (quotation omitted); *Ruppel v. Kucanin*, 2011 WL 2470621, at *7 (N.D. In. July 20, 2011) ("The evidence shows that while DTI is a

relatively new technology, it is gaining general acceptance as a method for detecting TBI.").

It is curious that Defendant would submit a brief to this Court without acknowledging that DTI data can and has been found to be admissible and an accepted methodology upon which an expert could base his or her opinion. The failure to disclose these cases (or otherwise address them) is, at best, a significant oversight, and at worst, a violation of Defendant's duty of candor to the court. The specter of impropriety is raised when one considers the fact that *another* court in this District, dealing with the *exact* type of challenge to DTI data raised in an almost *identical* case, made this same point to another cruise line when it failed to disclose a multitude of cases where such data was deemed admissible. *See Marsh*, 2017 WL 6987718, at *3, n.2 ("It is worth noting that Celebrity failed to disclose the fact that DTI testimony has been previously admitted by a multitude of federal courts. In fact, Celebrity did not cite a single case in which DTI evidence was admitted at trial."). And this type of "hide the ball" tactic appears all the more troublesome when, later in its Motion, Carnival directs this Court's attention to several cases in which one of Plaintiff's experts had been precluded from testifying at trial. [D.E. 45, p. 16]. What is good for the goose is apparently not also good for the gander.

We will not preclude any of Plaintiff's experts from testifying based on Defendant's arguments related to the DTI data. We also reject Defendant's argument that Dr. Walker's MRI report should be precluded from reaching the jury for his failure to produce an expert report, as the record makes clear that the doctor is a

treating physician and no report is required of such a witness. *See Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir 2011) (a treating physician may offer lay opinion testimony when that opinion "is based on his experience as a physician and [is] clearly helpful to an understanding of his decision-making process in the situation"). There is also no indication that Plaintiff intends to call Dr. Walker at trial as a live witness. [D.E. 76-1].

As such, we find no basis to preclude the MRI report from being admitted into evidence, and the Motion as to its introduction – and any reliance on same – is denied.

### B.     *Temporal Proximity*

Carnival next argues that Dr. Suite and Dr. Russell should not be allowed to testify as experts because each bases their opinion "on temporal proximity." [D.E. 45, p. 7]. Defendant is correct that temporal proximity "is generally not a reliable indicator of a causal relationship." *Guinn v. AstaZeneca Pharms. LP*, 602 F.3d 1245, 1254 (11th Cir. 2010); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (holding that using temporal proximity to establish causation "is not an exercise in scientific logic but in the fallacy of post-hoc proper-hoc reasoning, which is as unacceptable in science as in law."). And, standing alone, the mere fact that a plaintiff's symptoms occur relatively close to a specific underlying incident would be grounds for exclusion. *See Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996) ("It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Federal Rule of Evidence 702].").

Carnival's argument still misses the mark. The record shows that Dr. Russell and Dr. Suite do not based their opinions *solely* on temporal proximity, despite Defendant's arguments to the contrary. *See Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1297 (M.D. Fla. Feb. 6, 2009) ("*Standing alone*…temporal proximity [ ] is legally insufficient.") (emphasis added). Indeed, both doctors' causation testimony is significantly more developed than one would be led to believe by Carnival's Motion, and the arguments contained in the Motion to Strike are based more on a selective reading of each expert's deposition rather than some flaw in the doctors' methodology.

In its challenge to Dr. Russell based on its temporal proximity argument, Carnival asserts that her opinions are improper because the doctor did not have "any pre-incident data [that] could serve as a 'baseline' for Plaintiff's pre-incident cognitive functioning." [D.E. 45, p. 7]. Ignoring the fact that such a challenge goes to weight, not admissibility, Dr. Russell provided a simple explanation for why this would be the case, testifying that it would be "very rare" for someone to undergo pre-incident cognitive testing without cause to do so. [D.E. 59-3, p. 4]. Further, the doctor stated that the tests she administered to Mr. Ward during his evaluation would be "fairly good indicators" of his pre-morbid level of cognitive functioning. *Id*. The doctor makes clear, then, that an absence of cognitive functioning is not abnormal, and that the tests she administered could reliably provide information on Plaintiff's pre-incident cognitive function. Thus, any assertion that Dr. Russell based her opinions solely on "temporal proximity" is flatly contradicted in the record before this Court.

The same is true for Dr. Suite. A review of his deposition shows that Suite's opinion as to the cause of Mr. Ward's alleged condition had not been based solely on the temporal proximity to the underlying incident. Dr. Suite testified he relied on MRI studies performed on Plaintiff's brain after the incident, in addition to medical records that pre-dated his fall, before rendering any opinions in this case. [D.E. 52-2, pp. 4, 6, 12]. Once again, Defendant's claims are undermined by the clarifying testimony Dr. Suite gave in his deposition; and even if this were not the case, the arguments raised here are much better-suited for cross examination. *See Brown v. NCL (Bahamas) Ltd.*, 2016 WL 3251931, at *5 (S.D. Fla. June 10, 2016); *In re TMI Litig. Cases Consol. II*, 922 F. Supp. 1038, 1043-44 (M.D. Pa. 1996) (finding that a doctor's "failure to consider certain potentially relevant data goes to the weight of the testimony.").

### C.     *The Remaining Opinions Included in Dr. Russell's Report*

We can summarily reject Defendant's third argument as to why Dr. Russell's opinion should be excluded, which involves its claim that the doctor did not account for several other causes that might explain any cognitive deficiency or mimic symptoms of brain injury. [D.E. 45, p. 8]. This is not proper grounds under *Daubert*, and we reject it outright. *See Chapman v. Proctor & Gamble Distributing, LLC*, 766 F.3d 1296, 1308-09 (11th Cir. 2014) ("A reliable differential analysis need not rule out all possible alternative causes.") (internal quotation omitted); *Whelan v. Royal Caribbean Cruises, Ltd.*, 976 F. Supp. 2d 1328, 1332 (S.D. Fla. 2013) ("[A]n expert need not rule out *all* possible alternative causes, [and] it follows that he need not

decide on one cause in particular to the exclusion of all others. And, on a more fundamental level, the focus of a *Daubert* inquiry 'must be solely on principles and methodology, not on the conclusions that the generate.'") (emphasis original; quoting *Daubert*, 509 U.S. at 580).

Carnival's other arguments in support of its Motion are equally unavailing. First, it makes an unsupported logical leap that because Dr. Russell cannot opine on *causation*, she should not be able to opine *whatsoever*. *See* D.E. 45, p. 10 (arguing that because Dr. Russell cannot say whether the alleged cruise accident caused Plaintiff's cognitive issues, "[h]er testimony that Plaintiff suffers from a traumatic brain injury should be precluded."). Defendant has provided no support for such a position, and we find no grounds to exclude an expert's testimony based on broad assertions and conclusory statements made by counsel.

Next, Defendant seemingly contends that because Plaintiff made several misstatements in his deposition about his treatment with Dr. Russell and her ultimate diagnosis, it somehow justifies *the doctor's* opinion being struck in its entirety. Carnival once again has failed to provide this Court with anything even remotely approaching what one could consider "legal authority" that could support this position. Even worse, Defendant somehow contends that Dr. Russell's failure to videotape her examination of Plaintiff in some way renders her entire opinion obsolete, once again relying only on broad, conclusory statements about how this in some way triggers *Daubert* exclusion. These arguments – and we are beginning to

notice a pattern here – are not appropriate for *Daubert* challenge, but instead should be raised on cross examination.

Thus, the Motion as to Dr. Russell is denied.

### D.     *Dr. Nicholas Suite*

Defendant next asks us to preclude Dr. Suite from offering any opinions in the matter, challenging his conclusions by arguing: (1) the doctor failed to consider Plaintiff's other pre-existing medical conditions when determining that Ward's impairments were caused by the underlying incident giving rise to the Complaint; and (2) he is not qualified to render opinions on Mr. Ward's cervical or lumbar injuries because he is not an orthopedic surgeon. [D.E. 45, pp. 13-15]. We find both arguments unpersuasive.

Regarding the first challenge, Defendant asserts that Dr. Suite ignored Plaintiff's pre-existing hyperlipidemia, right wrist pain, and cervical and lumbar complaints that are allegedly reflected in the medical records that pre-date the incident. There are two issues with these arguments. First, a cursory review of Dr. Suite's report refutes the statement that he ignored pre-existing medical issues; the report makes clear that the doctor reviewed Plaintiff's *entire* medical history prior to reaching his conclusions, going so far as to note and list certain "general medical problems that were being monitored and treated by [Ward's] physicians" prior to the incident on the vessel. [D.E. 60-2, p. 2].[5] Second, Dr. Suite's report establishes that

---

[5]     That list included "hyperlipidemia," "spinal stenosis in the cervical region," "obesity," and "sleep apnea." *Id*.

certain injuries Plaintiff claims were the result of his fall on the *Conquest* are "related to" or "aggravated" by that incident; at no point does he contend that those injuries were *exclusively* attributable to his fall.[6] *See* D.E. 60-2. Thus, Carnival's contention that Dr. Suite's opinion "ignores the facts of the case" cannot be supported by this record.

Even if we found that Dr. Suite did fail to rule out certain pre-existing medical conditions prior to reaching his conclusions, such contentions are more appropriate for cross-examination. *See Jones*, 861 F.2d at 663 ("On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on admissibility.") (internal quotation omitted); *Ostroski v. United States*, 2007 WL 9701868, at *2 (S.D. Fla. Aug. 23, 2007) ("Any claimed weakness in the factual basis for [an expert's] conclusion…goes at best to weight and credibility, and can certainly be explored on cross examination.").

---

[6] Dr. Suite's report notes Plaintiff's "multiple pre-existing medical and surgical problems," which he believes "have been stable and treated." [D.E. 60-2, p. 6].

Moving to Dr. Suite's qualifications, we must first "examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Clena Investments, Inc.*, 280 F.R.D. at 661 (quotation omitted). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Id.* (citing *City of Tuscaloosa*, 158 F.3d at 562-63). But, as we stated above, the qualification standard for expert testimony is "not stringent," and "objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc.*, 674 F. Supp. 2d at 1325.

While Dr. Suite is not an orthopedic surgeon, there is no requirement that a doctor specialize in a particular field of medicine in order to render opinions in that medical specialty. *See McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (finding error for district court to exclude testimony of expert, not board-certified in emergency medicine, to render an opinion as to the applicable standard of care for emergency room physicians and nurses); (citing *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003) ("The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline. In fact, it would have been an abuse of discretion for the court to exclude [the expert's] testimony on [this] sole basis.")). And courts in this District have allowed doctors that do not specialize in orthopedics to nevertheless opine on orthopedic injuries alleged by individual plaintiffs in similar cases, so long as the doctor offering the opinion practices in a related field. *See Carlsen v. State Farm Mut. Auto Ins. Co.*, 2018 WL 2773369, at *5 (S.D. Fla. May 14, 2018) (admitting

testimony of non-orthopedic doctor specializing in physical medicine and rehabilitation to opine on future need for spinal surgery); *Galarza v. Carnival Corp.*, 2016 WL 7507883, at \*6-7 (S.D. Fla. Aug. 8, 2016) (rejecting cruise line's argument that physiatrist should not be able to opine on future need for surgeries because expert was not an orthopedic surgeon).

We also find it to be a bit of a stretch to make the case that a neurologist wholly lacks the ability to discuss, diagnose or otherwise opine on spinal injuries. *See Stone v. Fye*, 2017 WL 1199742, at \*10 (M.D. Ga. Mar. 31, 2017) ("[R]adiologist[s], orthopedic surgeon[s], [and] neurosurgeon[s]…[as] subspecialists[,] routinely diagnose and/or treat lumbar spine problems in their practice."); *see also Banister v. Burton*, 636 F.3d 828, 831-32 (7th Cir. 2011) (holding that emergency-room surgeon who treated shooting victim was adequately qualified to testify about victim's ability to throw or crawl at the time of treatment, despite not being a biomechanics expert or an orthopedic surgeon); *Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010) (holding that general practitioner could testify about possible effects of certain medications on decedent's heart condition because the issue did not concern "specialized knowledge held only be cardiologists."). Carnival arguably concedes this point in its briefing papers when it stated neurologists "treat patients with neurological complaints that have cervical and lumbar related sequelae." [D.E. 45, p. 14].

Nevertheless, we have reviewed Dr. Suite's curriculum vitae, expert report, and deposition transcript, and we find that he possesses the requisite training and

experience to offer the opinions included in his report. [D.E. 60-1, p. 3]. Accordingly, we find Dr. Suite qualified to opine on Plaintiff's alleged orthopedic injuries, although Defendant's counsel may certainly raise any issues concerning his particular area of practice on cross examination.[7]

### E. *Dr. Richard Rozencwaig*

We will also deny the Motion as to Dr. Richard Rozencwaig, who conducted a medical examination on Plaintiff on February 27, 2018. [D.E. 60-4]. Defendant – once again, in the broadest terms possible – argues that the doctor's diagnosis is speculative because "there are no imaging studies supporting [the] diagnoses" made as to Plaintiff's right wrist injury. [D.E. 45, pp. 15-16]. But Carnival does not support this argument with any legal authority that states that a doctor is *required* to rely on certain types imaging studies in order to make a determination as to a plaintiff's particular injuries, and so the Motion should be denied on this basis alone.[8]

Even if this were not the case, Carnival still overstates its position. Dr. Rozencwaig's report shows that he conducted an examination on Plaintiff, reviewed recent and prior medical records, and – most importantly, in light of Defendant's dubious claim that the entire report should be deemed speculative because imaging studies were allegedly never taken – ordered and interpreted x-rays of Ward's

---

[7]    We also note that Plaintiff has conceded that Dr. Suite cannot and will not opine on the injuries to Plaintiff's right wrist. [D.E. 54, p. 15].

[8]    For this same reason, we also reject Carnival's argument that Dr. Rozencwaig's opinions on Plaintiff's medical bills and his examination of the cervical spine should be precluded.

shoulder, arm, and wrist. [D.E. 60-4, pp. 3-5]; *see also Chau v. NCL (Bahamas) Ltd.*, 2017 WL 3623562, at \*11 ("Examining patients, taking a medical history, reviewing x-rays and concluding that [a plaintiff's] injury was caused by [a] then-recent fall is consistent with techniques that have been generally accepted in the proper scientific community."). Should Defendant wish to challenge the doctor's failure to consult certain types of imaging studies, it may do so at trial; but this does not support its argument that Rozencwaig's opinion be struck in its entirety, and we refuse to read *Daubert* with Carnival's requested breadth. *See Wilson v. Taser Intern., Inc.*, 303 F. App'x 708, 714 (11th Cir. 2008) ("Furthermore…a doctor usually may primarily base his opinion as to the cause of a plaintiff's injuries on his history where the plaintiff has sustained a common injury in a way that it commonly occurs.") (citation omitted). As such, Dr. Rozencwaig will be permitted to testify at trial as to each of the opinions outlined in his report.

### E. *Dr. Ronald Zollo*

In its final argument, Carnival moves to preclude Plaintiff from offering testimony from Ronald F. Zollo. Plaintiff retained Dr. Zollo to provide engineering opinions with respect to the surface of the subject bathroom, in addition to the design and maintenance of the flooring where the incident took place. [D.E. 48-4]. Dr. Zollo intends to offer the following opinions: (1) the wet condition of the subject bathroom floor created a foreseeable hazard that would be known to cause falls like the one suffered by Plaintiff; (2) the hazardous condition of the subject flooring surface were caused by the design, construction and maintenance defects that allowed "liquid

contaminants" to become present on the floor, and that such defects were known to Carnival; (3) under the events described by Plaintiff, and with the condition of the floor as it allegedly was, a person would not be able to adjust accordingly in order to prevent a slip-and-fall incident from occurring; and (4) Carnival's expert's conclusions have "no bases in science of physics or mechanics."

Carnival raises three separate challenges to these opinions. First, Carnival argues that Dr. Zollo's opinions are, in fact, mere speculation because Zollo's methodology is "not scientifically valid." [D.E. 45, p. 17]. Defendant alleges that Dr. Zollo merely bases his opinions on his experience, and that such experience alone cannot satisfy *Daubert* and Rule 702's requirements. *Id*. Next, Carnival asks that we preclude Dr. Zollo from testifying about water contamination on the date of Plaintiff's incident, once again claiming that such an opinion is speculative. [D.E. 45, p. 18]. In particular, Carnival argues that Dr. Zollo's expert and rebuttal reports failed to include any analysis he conducted on the plumbing aboard the vessel in question and its potential impact on the incident giving rise to the Complaint. *Id*. Carnival's third challenge involves its contention that Dr. Zollo cannot reliably opine that the hazards Plaintiff alleges were present prior to his fall were "foreseeable" to Defendant and therefore should have been known and addressed prior to Mr. Ward's fall. [D.E. 48-4, p. 9].

We have reviewed Dr. Zollo's report, his deposition, and other relevant portions of the record and we find no basis to preclude his opinions from reaching the jury – *in this case*. We disagree that the opinions are not scientifically valid, as Carnival

argues; Dr. Zollo visited the subject vessel, took measurements of the bathroom floor where the incident took place, and compared those measurements with standards he believes are applicable to the floor at issue. Further, Dr. Zollo's explanation as to the various standards used by professionals in this particular field, and what those standards required with regard to minimum levels of coefficient of friction and slip resistance, will be helpful to the jury.

Carnival is free to explore at trial whether those standards should be used in the maritime passenger context, and – if so – whether the standards discussed by Dr. Zollo would have any applicability in the area of the vessel where Ward's fall allegedly took place. *See Sorrels*, 796 F.3d at 1282 (finding district court abused its discretion in excluding witness from testifying about certain ASTM standards by relying on other standards that contained discrepancies with those used by challenged expert); *Holderbaum v. Carnival Corp.*, 2015 WL 5006071, at *6 (S.D. Fla. Aug. 23, 2015) ("[Defendant's] contention that certain ambiguities in the regulations render [the expert's] testimony as pure speculation is misplaced, as the ambiguities in these regulations actually *reinforce* the need for an expert to assist the jury in sorting through these sources to try to establish the standard of care in this negligence action."); *see also Cook v. Royal Caribbean Cruises, Ltd.*, 2012 WL 1792628., at *3 (S.D. Fla. May 15, 2012). Defendant's challenge is an attack on the weight that should be given to Dr. Zollo's opinion by the jury, not whether that opinion should be struck as a whole. But to entirely prevent that testimony from reaching the jury would be error. *Holderbaum*, 2015 WL 5006071, at *6 ("Carnival's contentions may surely be

addressed during cross examination, but they are not a reason to strike the expert's findings or preclude his testimony at trial.").

The other arguments raised by Carnival in support of its Motion – many of which are presented in a haphazard, "shotgun-style" format – are unavailing. Proffering these arguments in such a way makes it difficult to determine which arguments apply to each of Zollo's opinions, and it is not our duty to attempt to sort out what is what. Based on the record before us, we find it would be improper to exclude Dr. Zollo's testimony, as he satisfies the qualification, reliability, and helpfulness prongs set forth by the Eleventh Circuit. *See Quiet Technology*, 326 F.3d at 1341.

## V. CONCLUSION

For the reasons stated herein, we find that both Motions should be **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of March, 2019.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge